IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| HAI NGUYEN, Administrator of the Estate of SABRINA NGUYEN, deceased,<br><br>  Plaintiff,<br><br>v.<br><br>CITY OF MEMPHIS, TENNESSEE,<br>ANDRES JUAREZ, individually,<br>DANIEL ADAMS, individually,<br>JAMES PREBLE, individually,<br>D. IGLEHARTE, individually,<br>RUSSELL STEVENS, individually,<br>PATRICK MULROY, individually,<br>JAMES BOYLAN, individually, and<br>SHELBY COUNTY, TENNESSEE,<br><br>  Defendants. | Case No.: 2:21-CV-2003-JPM<br><br>***<i>JURY TRIAL DEMANDED</i> |

## FIRST AMENDED COMPLAINT

NOW COMES, Plaintiff, HAI NGUYEN, Personal Representative of the Estate of SABRINA NGUYEN, deceased, by and through his attorneys, LAUX LAW GROUP, and for his amended cause of action, states as follows:

### INTRODUCTION

In 1896, Justice Marshall Harlan gave his enlightened dissent in *Plessy v. Fergusson*, 163 U.S. 537, 552, 16 S. Ct. 1138, 1144 (1896), the infamous Supreme Court case wherein the majority birthed the atrocious "separate but equal" doctrine:

> But in view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.

> The humblest is the peer of the most powerful. The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme law of the land are involved. It is therefore to be regretted that this high tribunal, the final expositor of the fundamental law of the land, has reached the conclusion that it is competent for a state to regulate the enjoyment by citizens of their civil rights solely upon the basis of race. *Id.* at 559, 16 S. Ct. at 1146-1147.

Justice Harlan's dissent was eventually validated and, a century later, the vision statement of the Memphis Police Department's (MPD) would seem to reflect the democracy cornerstone he articulated. Indeed, MPD's stated vision is to create and maintain for the City of Memphis an environment of public safety recognized for its intolerance for crime and compassion and responsiveness to the needs, rights, and expectations of *all* citizens, employees and visitors.

MPD's purported vision of impartiality extends to black letter policy as MPD officers are charged with protecting the rights of *all* persons within MPD jurisdiction to be free from criminal attack, to be secure in their possessions and to live in peace. Its role is to enforce the law in a fair and impartial manner, which is reflected in some of the stated goals of the Law Enforcement Code of Ethics MPD officers swear to uphold: to "*protect…the weak against oppression or intimidation, and the peaceful against violence or disorder.*"

## JURISDICTION AND VENUE

1. This action arises under the United States Constitution, particularly under the Fourteenth Amendment, and under law, particularly 42 U.S.C. § 1983. This Honorable Court has jurisdiction by virtue of 28 U.S.C. § 1331. Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff, HAI NGUYEN (hereafter "PLAINTIFF"), complains arose in this District.

## PARTIES

2. At all relevant times, PLAINTIFF was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America. PLAINTIFF is the natural father of SABRINA NGUYEN (hereafter "SABRINA"), who was killed by Keedrin Coppage (hereafter "COPPAGE") on January 2, 2020. On August 20, 2020, PLAINTIFF was duly appointed administrator of SABRINA's probate estate. See Shelby County Probate Court Order Appointing Administrator and Letters of Administration, attached hereto, and incorporated herein, as Exhibit 1.

3. SABRINA, a female, was of Vietnamese descent and a Vietnamese American U.S. citizen by birth. At the time of her death, SABRINA was an 18-year-old adult. At all relevant times, SABRINA was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.

4. At all relevant times, PLAINTIFF resided in Memphis, Tennessee, in the Hyde Park neighborhood. PLAINTIFF resided with his family, including his natural daughter, SABRINA. PLAINTIFF brings this lawsuit on behalf of SABRINA's estate and also on behalf of her wrongful death beneficiaries, namely, PLAINTIFF (natural father), Nhung Nguyen (natural mother), Daniel Nguyen (brother) and Jimmy Nguyen (brother).

5. Defendant, CITY OF MEMPHIS, TENNESSEE (hereafter "CITY"), is a municipality duly incorporated under the laws of the State of Tennessee, which can be served with process through Jennifer A. Sink, City Attorney and Chief Legal Officer for the CITY, located at 125 N. Main Street, Memphis, TN 38103, or wherever she may be found. The CITY is situated within Shelby County, TN.

6. Defendant MPD Officer ANDRES JUAREZ (hereafter "JUAREZ"), Badge No. 13203, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, JUAREZ was acting within the scope of his employment and under the color of state law.

7. Defendant MPD Officer DANIEL ADAMS (hereafter "ADAMS"), Badge No. 13309, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, ADAMS was acting within the scope of his employment and under the color of state law.

8. Defendant MPD Officer JAMES PREBLE (hereafter "PREBLE"), Badge No. 1693, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, JUAREZ was acting within the scope of his employment and under the color of state law.

9. Defendant MPD Officer D. IGLEHARTE (hereafter "INGLEHARTE"), Badge No. 10015, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, INGLEHARTE was acting within the scope of his employment and under the color of state law.

10. Defendant MPD Officer RUSSELL STEVENS (hereafter "STEVENS"), Badge No. UNK, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, STEVENS was acting within the scope of his employment and under the color of state law.

11. Defendant MPD Officer PATRICK MULROY (hereafter "MULROY"), Badge No. 11613, is an adult resident citizen of Tennessee, and may be served with process at the

MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, MULROY was acting within the scope of his employment and under the color of state law.

12. Defendant MPD Officer JAMES BOYLAN (hereafter "BOYLAN"), Badge No. UNK, is an adult resident citizen of Tennessee, and may be served with process at the MPD, 170 N. Main Street, Memphis, TN 38103, or wherever he may be found. At all relevant times, BOYLAN was acting within the scope of his employment and under the color of state law.

13. Defendant, SHELBY COUNTY, TENNESSEE (hereafter "SHELBY CO."), is duly incorporated under the laws of the State of Tennessee, and can be served through Marlinee Clark Iverson, County Attorney for SHELBY CO., located at 160 N. Main Street, Memphis, TN 38103, or wherever she may be found. The Defendants shall collectively be referred to herein as "DEFENDANTS."

14. Upon information and belief, the CITY and SHELBY CO. are the employers of the individual defendants and are governmental entities subject to the requirements of 28 U.S.C. § 1983. The CITY and SHELBY CO. were and are responsible for assuring that the actions, policies and procedures guiding their respective officers are constitutional and do not deprive citizens of fundamental guaranteed rights.

## HISTORY AND FACTUAL BACKGROUND

### City of Memphis and Shelby County Homicide and Violent Crime Statistics

15. In September 2020, the non-profit Washington-based Violence Policy Center released its annual study which showed that the State of Tennessee ranked fourth among states in terms of women killed by men. Tennessee has placed among the top 10 states in the Violence Policy Center's study for nearly ten (10) years. As of 2018, nationally, Tennessee ranked fifth

alongside South Carolina for its homicide rate among female victims murdered by males. That rate is 2% in Tennessee compared to 1.29% on average across the United States.

16. According to the most recent United States Census estimate, non-white individuals comprise approximately 70% of Memphis' population. And yet, according to official MPD documents, during the first quarter of the calendar year 2017, non-white Memphis citizens —*i.e.*, racial or ethnic minorities—accounted for 39 of 45 Memphis homicide victims, or approximately 87%.

### Hyde Park Neighborhood, Memphis, Tennessee

17. Hyde Park is a neighborhood in Memphis consisting of 2.535 square miles with a population of 4,775, according to the latest available figures. Racial and ethnic minorities comprise approximately 91% of Hyde Park's population. In 2018, the median household income in Hyde Park was $25,113, while in Memphis generally the median household income was significantly higher at $38,826. The percentage of the population living below the poverty level in Hyde Park was 43.7% in 2018, compared to 26.9% in Memphis generally.

### MPD's Domestic Violence Unit

18. By 2018, the MPD handled an average of approximately 50,000 domestic violence-related calls each year. The MPD's Domestic Violence (DV) Unit is responsible for investigating incidents involving domestic violence. Domestic violence is broadly defined in Tennessee and includes: cases involving infliction of injury, including assault; threats to inflict harm (including stalking); physical restraint; and malicious damage to personal property of an abused person.

19. The DV Unit works closely with Shelby County Sheriff's Office (SCSO) regarding domestic violence warrants and protective orders. Between 2015 and 2018, the DV

Unit reviewed an average of nearly 18,000 cases per year, which included approximately 1,800 aggravated assaults and 9,500 simple assaults per year.

### MPD and SCSO Implement the Lethality Assessment Program (LAP), a Domestic Abuse Reduction Strategy

20. In March 2018, the MPD implemented the Lethality Assessment Program (LAP), a lethality screen for domestic violence victims recognized by the U.S. Department of Justice as a "promising practice" in intimate partner homicide prevention. SCSO had implemented LAP earlier, in October 2017.

21. Described as "an innovative strategy to prevent domestic violence homicides and serious injuries by providing an easy and effective method for law enforcement and other advocates to identify victims of domestic violence who are at the highest risk," LAP is an evidenced-based tool developed from extensive research on lethality indicators preceding domestic violence homicide.

22. Based on a 2015 study regarding LAP's effectiveness,[1] researchers found that victims who receive the LAP screening were:

- Nearly two (2) times more likely to receive immediate services and obtain medical care;
- 2.5 times more likely to remove or hide their abuser's weapons; and
- 1.5 times more likely to engage in protective actions.

23. Among the purposes of LAP are assisting with reducing domestic violence homicides and increasing access to services for victims of domestic violence. LAP allows

---

[1] Messing, Jill Theresa, Jacqueline Campbell, Daniel W. Webster, Sheryll Brown, Beverly Patchell, and Janet Sullivan Wilson. "The Oklahoma Lethality Assessment Study: A Quasi-Experimental Evaluation of the Lethality Assessment Program." *Social Service Review* 89.3 (2015): 499-530. Web.

officers to learn about prior, potentially lethal incidents and gives them an evidence-based tool to evaluate the victim's future danger. Contact with the hotline advocate is important because the advocate can provide the victim with a different perspective on their situation, making them more likely to engage in services.

24. Using a simple 11-question survey, responding MPD and SCSO officers can determine whether the victim is at immediate risk for further harm. If, based on the answers, a person is determined to be at risk, the officer—while still on the scene—will call the Family Safety Center of Memphis. A victim's advocate with the center will then talk to the person about several options, including leaving.

25. Generally speaking, LAP consists of the following steps:

- If the victim screens in as "high risk," the officer calls the Family Safety Center's 24-hour hotline.

- The victim may or may not choose to speak with the domestic violence hotline advocate.

- If the victim does not choose to speak with the hotline advocate, the officer makes a plan with the advocate on how the victim can stay safe.

- If the victim chooses to speak with the hotline advocate, the individual makes a plan with the advocate on how they can stay safe.

- The victim may give permission for the hotline to follow up in 24 hours about additional needs.

26. On August 7, 2018, the Commercial Appeal published an article entitled "*Memphis Police, Shelby County implement domestic violence program*," which detailed the implementation of LAP at MPD.

27. In the article, MPD Major J.D. Smith, who headed the department's domestic violence unit in 2018, said LAP is in use at all of MPD's nine precincts. Major Smith noted the causal connection between officer intervention and saving lives, stating:

> I'll say that the assessment program is one of the best tools we can use because more than likely at that time, the escalation of violence has gotten to the extreme where the next move is possibly going to result in a fatality. [LAP] allows us to get hands on, early on, and that is key.

28. By 2018, through departmental domestic violence training and LAP training, MPD officers and SCSO deputies knew or should have known that on average a person will attempt to leave an abusive situation seven times before they finally escape.

## Months of Domestic Violence Committed Against SABRINA Escalates After She is Denied Reentry into Safe House

29. SABRINA and COPPAGE began dating in early 2019 and it was not long before major concerns arose. Starting in April 2019, COPPAGE began physically and mentally abusing SABRINA. On April 5, 2019, SABRINA called MPD after COPPAGE hit her on the head with a bag of tools.

30. On June 14, 2019, COPPAGE smashed SABRINA's cell phone and committed aggravated assault against her, which necessitated she receive medical treatment at Baptist East Hospital. On June 15, 2019, COPPAGE attacked SABRINA, knocking her unconscious and kidnapping her. COPPAGE fled the scene to his home on the 5500 block of Patsy Circle but was soon arrested by SCSO. SABRINA was again admitted to the hospital.

31. On or about June 15, 2019, DEFENDANTS, and each of them, placed SABRINA in a safe house or assisted with her placement in a safe house. The reason that SABRINA was placed in a safe house was that COPPAGE presented an imminent threat of death or serious bodily injury to SABRINA, a fact known by DEFENDANTS, and each of them.

9

32. On June 17, 2019, a protection order was put in place preventing any contact between COPPAGE and SABRINA, per MPD report. The protection order required that SABRINA provide the residential address of the respondent, COPPAGE, which she did. The protection order issued on June 17, 2019 went into effect on that date and, upon information and belief, did not expire for one (1) year at a minimum. The protection order SABRINA signed provided notice to COPPAGE of the penalties that would attach were he to violate the provisions of the protection order.

33. After approximately one (1) week at the safe house, SABRINA left the location and traveled to the hospital due to the lingering injuries she sustained during the prior attack by COPPAGE.

34. When she returned from the hospital, she was refused reentry into the safe house by DEFENDANTS, and each of them, because SABRINA purportedly did not inform anyone associated with the facilitation of the safe house that she intended to visit the hospital.

35. SABRINA was forced to return to her residence.

36. In July 2019, COPPAGE acknowledged to both MPD and SCSO his knowledge of the fact that SABRINA had filed a protection order against him.

37. On or around August 10, 2019, COPPAGE again kidnapped SABRINA and sexually assaulted her, before transporting her to Collierville, Tennessee. SABRINA was able to break free and eventually received hospital treatment.

38. On or about September 11, 2019, COPPAGE again issued death threats to SABRINA via telephone and text message. The following day, COPPAGE jumped out of bushes outside of SABRINA's house as she tried going to court to prosecute her case against him. COPPAGE attacked her and tried to abduct her.

39. Between mid-September 2019 and December 19, 2019, COPPAGE continued his unchecked reign of terror on SABRINA which included the following egregious acts of domestic violence and intimidation:

- Physically appearing up at her work looking for her;
- Sending countless threatening text messages;
- Making countless harassing and violent phone calls to her;
- Stalking her as she went to and from work;
- Committing multiple physical assaults of her;
- Committing forcible rapes of her;
- Kidnapping her a second time;
- Confronting and threatening SABRINA with death in front of Shelby County courthouse; and
- Kidnapping her a third time while brandishing a knife.

40. SABRINA managed to escape from the third kidnapping by COPPAGE on December 19, 2019. On December 20, 2019, SABRINA again went to MPD seeking protection from COPPAGE. She received none.

41. On December 20, 2019, COPPAGE kidnapped SABRINA a fourth time, this time forcing SABRINA into the trunk of her own car before taking her across state lines against her will. COPPAGE held SABRINA against her will for three (3) days, physically abusing and mentally tormenting her during this time.

42. On the morning of December 23, 2019, SABRINA escaped. On that date, at approximately 12:12 pm, SABRINA went to the MPD station on N. Main Street. Despite the MPD policy which requires officers to offer to transport a domestic violence victim to a place of safety such as a shelter, another similar service, or a friend's or family's residence, SABRINA

received no such offer from MPD.  Instead, without her car, she was forced to call a friend for a ride home from MPD.

43. At all relevant times, including December 23, 2019 through January 2, 2020, there were multiple arrest warrants issued for COPPAGE based on domestic violence and other profoundly serious crimes.  Despite this—and despite the black letter MPD policy mandating immediate arrest—no one from MPD or SCSO attempted to arrest or apprehend COPPAGE at any time during this crucial timeframe.

44. SABRINA was last seen alive on December 31, 2019 walking on the street near her neighborhood.  At that time, it is believed that she was trying to reclaim her car which she needed for work and for her own safety.

45. On January 2, 2020, SABRINA's lifeless body was found on a sidewalk by a passerby at the intersection of Jackson Ave. and Maple Drive.  The passerby called 911 and the Memphis Fire Department responded, confirming SABRINA's death a 11:48 am.

46. A Shelby County medical examiner arrived on the scene at approximately 1:00 pm and performed a brief body exam, after which SABRINA's body was transported to the West Tennessee Regional Forensic Center for autopsy.  SABRINA's body was autopsied the following day, January 3, 2020.  The manner of death was homicide.  The cause of death was multiple sharp force injuries.

47. According to her autopsy report, SABRINA suffered thirty-eight (38) multiple sharp force injuries and multiple blunt force injuries.  Specifically, SABRINA suffered eleven (11) total sharp force injuries of her torso (three (3) incised wounds to abdomen; five (5) incised wounds to back; and one (1) stab wound each to abdomen, back and left shoulder).

48. She also suffered twenty-seven (27) sharp force injuries of her extremities (right thigh, right arm, right forearm, left forearm (2), left wrist, left arm (11), right arm (5); and many to her left leg). SABRINA's injuries are consistent with a vicious attack and reveal considerable defensive wounds, which is evidence indicative of her frantically trying to protect herself.

49. Even though, at all relevant times, DEFENDANTS, and each of them, knew where COPPAGE resided, on or about January 2, 2020, MPD nonetheless contacted the U.S. Marshals for assistance arresting him. The U.S. Marshals went to COPPAGE's home—where he was predictably located—and promptly arrested him for SABRINA's murder.

50. On or about January 12, 2020, Lt. Louis Brownlee stated publicly that MPD officers followed the LAP risk assessment steps in each of their interactions with SABRINA in 2019.

51. Contrary to the purported vision statement espoused by the MPD, SABRINA was definitely not free from criminal attack during the last year of her life. SABRINA was not secure in her possessions and she most certainly did not live her final, tragic days in peace.

<u>COUNT I</u>
**ALL DEFENDANTS**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT—42 U.S.C. § 1983**

52. PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through fifty-one (51) above as and for Paragraph fifty-two (52) of Count I.

53. Generally, there is no constitutional right, either in the due process clause or the equal protection clause, to be protected against being attacked or sexually assaulted by a member of the general public. And consequently there is no corresponding duty placed on the state and its officers requiring them to act when members of the general public are in danger.

54. However, the state may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts. Thus, the law recognizes the possibility for governmental liability in instances where the state has increased the chance of danger for a citizen seeking its protection. This is referred to as the "state-created danger" theory, and it is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence.

55. In the present case, DEFENDANTS, and each of them, created—or, at least, greatly increased—the risk that SABRINA would be exposed to private acts of violence by COPPAGE by refusing her reentry into the safe house after her visit to the hospital. The denial of SABRINA's reentry into the safe house was known by COPPAGE, and it emboldened him to increase the level of violence he directed at SABRINA until he ultimately killed her on January 2, 2020.

56. Moreover, DEFENDANTS, and each of them, greatly increased the risk that SABRINA would be exposed to private acts of violence by COPPAGE when they refused to retrieve SABRINA's car at his residence. DEFENDANTS knew COPPAGE had SABRINA's car and knew that she needed it for her protection and sustenance. Despite this information, and despite the prior history of which DEFENDANTS were aware, DEFENDANTS, and each of them, affirmatively refused to follow policy requiring the arrest of COPPAGE.

57. DEFENDANT's actions were unnecessary, objectively unreasonable and deliberately indifferent. Therefore, DEFENDANTS are liable to SABRINA and PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

## COUNT II
### CITY OF MEMPHIS, JUAREZ, INGLEHARTE, STEVENS, PREBLE, BOYLAN AND ADAMS
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT—42 U.S.C. § 1983

58. PLAINTIFF hereby incorporates and re-alleges Paragraphs one (1) through fifty-seven (57) above as and for Paragraph fifty-eight (58) of Count II.

59. Police officers do not owe a duty of protection to individuals. However, where the state discriminates in providing protection to members of the public; those situations violate the equal protection clause of the Fourteenth Amendment. The equal protection clause operates to bar discrimination or disparate treatment based on classifications that are not rationally related to a legitimate government purpose.

60. So, although there is no general constitutional right to police protection, there state may not discriminate in providing such protection.

61. Equal protection rights are violated when (1) a person is a member of an identifiable class; (2) that person is intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. Discriminatory intent implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker selected or reaffirmed a particular course of action at least in part because of–not merely in spite of–its adverse effects upon an identifiable group.

62. It is well settled that the equal protection clause is applicable not only to discriminatory legislative action, but also to discriminatory governmental action in administration and enforcement of the law.

63. City officials and police officers are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community. This duty applies equally

to women whose personal safety is threatened by individuals with whom they have or have had a domestic relationship as well as to all other persons whose personal safety is threatened, including women not involved in domestic relationships.

64. Police action is subject to the equal protection clause and Section 1983 whether in the form of commission of violative acts or omission to perform required acts pursuant to the police officer's duty to protect.

65. It is clearly established law that the police may not discriminate on the basis of race, gender or socio-economic background. The state may not selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.

66. SABRINA is a member of an identifiable group. As pled above, she is a female domestic violence and murder victim, of Asian descent, who has been treated differently on account of her race, gender and victim status. PLAINTIFF further alleges that these defendants, and each of them, acted with discriminatory intent in:

   a) refusing to investigate criminal acts—including sex crimes and kidnapping—against SABRINA and in refusing to arrest or timely arrest COPPAGE in December 2019;

   b) failing, in SABRINA's case, to perform mandatory tasks associated with sex crimes, such as facilitating SAFE kits, preserving the crime scene; and

   c) failing to properly initiate and/or complete the LAP process with SABRINA.

67. An individual who alleges that a police officer intentionally treated her differently than other similarly situated individuals and alleges that there was no rational basis for the difference in treatment, states a viable Fourteenth Amendment Equal Protection Claim, be it race, gender or victim status.

68. These defendants' failure to act was pursuant to a custom, pattern and/or practice of affording inadequate protection, or no protection at all, to minority women from disadvantaged who have complained of having been abused or sexually assaulted by people they know. This pattern of police misconduct was so pervasive as to constitute a "custom or usage" with the force of law. This practice is tantamount to an administrative classification used to implement the law in a discriminatory fashion. There is no rational basis for this disparate treatment.

69. The actions taken by thesevdefendants have violated SABRINA's rights as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in that she, as a female minority rape victim who lived in a part of Memphis where the residents generally earn less than Memphis generally, has been afforded less favorable terms and conditions then others similarly situated on the basis of her race, gender and socio-economic status, which is impermissible.

70. The custom described above was the moving force behind the violations of SABRINA's constitutional rights committed by these defendants, and each of them, and proximately caused her personal injuries, great pain and other damages. The custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to SABRINA by the Fourth and Fourteenth Amendments to the United States Constitution, including due process, and laws enacted thereunder.

71. These defendants' actions were unnecessary, objectively unreasonable and deliberately indifferent. Therefore, they are liable to SABRINA and PLAINTIFF in damages pursuant to 42 U.S.C. § 1983, including compensatory damages, costs, attorney's fees and punitive damages.

WHEREFORE, Plaintiff, HAI NGUYEN, Administrator of the Estate of SABRINA NGUYEN, deceased, by and through his attorneys, and requests judgment against DEFENDANTS, and each of them:

1. That the defendants be required to pay compensatory damages;

2. That the defendants be required to pay actual damages;

3. That the defendants be required to pay costs and attorney fees per 42 U.S.C. § 1988;

4. That the individual defendants be required to pay punitive damages; and

5. That Plaintiff have any other such relief as this Honorable Court deems just and proper, including declaratory and injunctive relief.

                      Respectfully submitted,

                      <u>Michael J. Laux</u>
                      Michael J. Laux
                      Western Dist. Tennessee Bar No. 6278834
                      One of the Attorneys for PLAINTIFF
                      LAUX LAW GROUP
                      400 W. Capitol Avenue, Suite 1700
                      Little Rock, AR 72201
                      Telephone: (501) 242-0750
                      E-mail: mlaux@lauxlawgroup.com
                                mikelaux@icloud.com